IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| ANGELA LIKELY, | ) | |
| On Behalf of her Minor Son T.R.J., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:11-cv-358-TMH |
| | ) | [WO] |
| | ) | |
| BETTY STRUZICK, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

**I.  INTRODUCTION**

This 42 U.S.C. § 1983 action is before the court on a complaint filed by Angela Likely

on behalf of her minor son T.R.J.  At the time of filing this case, T.R.J. was confined in the

custody of the Alabama Department of Youth Services ("DYS") at its Mt. Meigs Facility ("Mt.

Meigs") in Mt. Meigs, Alabama.[1]  In this complaint, Likely challenges the adequacy of medical

and dental treatment provided to T.R.J. during his confinement at Mt. Meigs in April and May

of 2011.  Likely names the Betty Struzick, Clinical Coordinator for the ABSOP at Mt. Meigs,

Barry Burkhart, Director of the Mt. Meigs ABSOP, Barbara Golden, a registered nurse who

serves as the Nurse Coordinator for the Department of Youth Services at the Mt. Meigs

Infirmary, Rick Taylor, a registered nurse employed at the facility, and Dr. Juan Chung, a

physician assigned to Mt. Meigs, as defendants in this cause of action.  Likely seeks declaratory

relief and monetary damages for the alleged violations of T.R.J.'s constitutional rights.

---

[1]During his confinement at Mt. Meigs, T.R.J. was a participant in the Accountability Based Sex Offender
Program ("ABSOP").

Defendants filed a special report and relevant supporting evidentiary materials, including affidavits and medical/dental records, addressing Likely's claims for relief. Pursuant to the orders entered in this case, the court deems it appropriate to construe the aforementioned report as a motion for summary judgment. *Order of June 27, 2011 - Doc. No. 11*. Thus, this case is now pending on Defendants' motion for summary judgment. Upon consideration of this motion, the evidentiary materials filed in support thereof and Plaintiff's response, the court concludes that Defendants' motion for summary judgment is due to be granted.

## II.  STANDARD OF REVIEW

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation to former rule omitted); Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").[2]  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue [- now dispute -]

---

[2]Effective December 1, 2010, Rule 56 was "revised to improve the procedures for presenting and deciding summary-judgment motions." Fed. R. Civ. P. 56 Advisory Committee Notes. Under this revision, "[s]ubdivision (a) carries forward the summary-judgment standard expressed in former subdivision (c), changing only one word -- genuine 'issue' becomes genuine 'dispute.' 'Dispute' better reflects the focus of a summary-judgment determination." *Id*. "'Shall' is also restored to express the direction to grant summary judgment." *Id*. Thus, although Rule 56 underwent stylistic changes, its substance remains the same and, therefore, all cases citing prior versions of the rule remain equally applicable to the current rule.

of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-24.

Defendants have met their evidentiary burden and demonstrated the absence of any genuine dispute of material fact.  Thus, the burden shifts to Plaintiff to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to this case exists.  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact by [citing to materials in the record including affidavits, relevant documents or other materials] the court may . . . grant summary judgment if the motion and supporting materials -- including the facts considered undisputed -- show that the movant is entitled to it.").  A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor.  *Greenberg*, 498 F.3d at 1263.

> In civil actions filed by or on behalf of an inmate, federal courts
>
> must distinguish between evidence of disputed facts and disputed matters of professional judgment.  In respect to the latter, our inferences must accord deference to the views of prison authorities [and medical personnel].  Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, 548 U.S. 521, 530 (2006) (internal citation omitted).  Consequently, to survive Defendants' properly supported motion for summary judgment, Likely is required to produce

"sufficient [favorable] evidence" which would be admissible at trial supporting the claims of constitutional violations. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); Fed. R. Civ. P. 56(e). "If the evidence [on which the nonmoving party relies] is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Id*. at 249-50. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1576-1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 242). Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine issue of material fact and, therefore, do not suffice to oppose a motion for summary judgment. *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (A plaintiff's "conclusory assertions . . . , in the absence of [admissible] supporting evidence, are insufficient to withstand summary judgment"); *Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir. 1995) (grant of summary judgment appropriate where inmate produces nothing beyond "his own conclusory allegations" challenging actions of the defendants); *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984) ("Mere verification of party's own conclusory allegations is not sufficient to oppose summary judgment . . . ."); *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("[C]onclusory allegations without specific supporting facts have no probative value."). Hence, when a plaintiff fails to set forth specific facts supported by requisite evidence sufficient to establish the existence of an element essential to the case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex*, 477 U.S. at 322 ("[F]ailure of proof concerning an essential element of the nonmoving party's case

necessarily renders all other facts immaterial."); *Barnes v. Sw. Forest Indus., Inc.*, 814 F.2d 607, 609 (11th Cir. 1987) (If on any part of the prima facie case the plaintiff presents insufficient evidence to require submission of the case to the trier of fact, granting of summary judgment is appropriate.).

For summary judgment purposes, only disputes involving material facts are relevant. *United States v. One Piece of Real Property Located at 5800 SW 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1101 (11th Cir. 2004). What is material is determined by the substantive law applicable to the case. *Anderson*, 477 U.S. at 248; *Lofton v. Sec'y of the Dep't of Children and Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment."). "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted). To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In cases where the evidence before the court which is admissible on its face or which can be reduced to an admissible form indicates there is no genuine dispute of material fact and the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper. *Celotex*, 477 U.S. at 323-24 (summary judgment appropriate where pleadings,

evidentiary materials and affidavits before the court show no genuine dispute as to a requisite material fact); *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001) (To establish a genuine dispute of material fact, the nonmoving party must produce evidence such that a reasonable trier of fact could return a verdict in his favor.).

Although factual inferences must be viewed in a light most favorable to the nonmoving party and *pro se* complaints are entitled to liberal interpretation by the courts, a *pro se* litigant does not escape the burden of establishing by sufficient evidence a genuine dispute of material fact. *Beard*, 548 U.S. at 525; *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990). Thus, Plaintiff's *pro se* status alone does not mandate this court's disregard of elementary principles of production and proof in a civil case. In this case, the plaintiff fails to demonstrate a genuine dispute of material fact in order to preclude summary judgment.

## III. DISCUSSION

### A. Relevant Facts

On April 14, 2011, T.R.J. slipped and fell while on a work detail in Booker Hall, a residential dormitory at Mt. Meigs. When he fell, T.R.J. struck the back of his head on the floor. Jawunza Adair, the dorm supervisor, was present at the time of T.R.J.'s fall. Adair and another staff member, Ms. Sharp, immediately provided assistance to T.R.J. When the staff members approached T.R.J., he was conscious, alert, and able to follow instructions given to him. In accordance with these instructions, T.R.J. remained supine on the floor for a few minutes. While on the floor, T.R.J. did not complain of any pain, and Adair and Sharp did not observe any open wound or blood on T.R.J.'s head. As he rose from the floor, T.R.J. complained that his head

hurt, and Ms. Sharp therefore escorted T.R.J. to the infirmary for evaluation and treatment.

On April 21, 2011 during dinner service, T.R.J. reported to Ferron Ford, a youth services aid, that he found a hard object in his peas.  T.R.J. did not inform Ford that he bit into the object or that he had chipped his tooth on the object.  T.R.J. likewise did not complain of pain to Ford nor did he request to go to the infirmary.  Ford reported the incident to the dining hall staff who advised the object could have been a frozen pea.  T.R.J. did not seek medical or dental treatment at any time from April 15, 2011 through April 25, 2011 for either his head injury or chipped tooth.  Subsequently, Likely contacted officials with DYS complaining of the medical treatment provided to T.R.J. for the injury to his head and ensuing headaches.  Based on the foregoing, Nurse Golden summoned T.R.J. to the facility's infirmary on April 26, 2011 for examination. In addition, T.R.J. was thereafter examined by medical personnel on multiple occasions for evaluation and treatment of his headaches and was also referred to a free world dentist for treatment of his chipped tooth.[3]

### B.  Deliberate Indifference

1. <u>Defendants Struzick and Burkhart</u>.  Likely appears to complain that Defendants Struzick and Burkhart failed to intervene regarding the medical and dental treatment provided by health care professionals with respect to T.R.J.'s head injury and chipped tooth.  The claim made against Defendants Struzick and Burkhart challenging the constitutionality of treatment provided by medical professionals entitles Plaintiff to no relief as

> [t]he law does not impose upon correctional officials a duty to

---

[3]The precise treatment provided to T.R.J. is set forth below in detail.

> directly supervise health care personnel, to set treatment policy for the medical staff or to intervene in treatment decisions where they have no actual knowledge that intervention is necessary to prevent a constitutional wrong. *See Vinnedge v. Gibbs*, 550 F.2d 926 (4th Cir. 1977) (a medical treatment claim cannot be brought against managing officers of a prison absent allegations that they were personally connected with the alleged denial of treatment). Moreover, "supervisory [correctional] officials are entitled to rely on medical judgments made by medical professionals responsible for prisoner care. *See, e.g.*, *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993); *White v. Farrier*, 849 F.2d 322, 327 (8th Cir. 1988)." *Williams v. Limestone County, Ala.*, 198 F[. App'x] 893, 897 (11th Cir. 2006).

*Cameron v. Allen*, 525 F. Supp. 2d 1302, 1307 (M.D. Ala. 2007).

To the extent Likely seeks relief from Defendants Struzick and Burkhart due to their supervisory roles for the treatment furnished by the facility's health care personnel, assuming *arguendo* these Defendants exerted some authority over the manner in which those persons responsible for the provision of medical/dental treatment rendered such treatment, the law is well settled "that Government officials may not be held liable for the unconstitutional conduct of their subordinates under the theory of *respondeat superior* [or vicarious liability]." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (citing *Robertson v. Sichel*, 127 U.S. 507, 515-16 (1888)) ("A public officer or agent is not responsible for the misfeasances or position wrongs, or for the nonfeasances, or negligences, or omissions of duty, of the subagents or servants or other persons properly employed by or under him, in the discharge of his official duties"). "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft*, 556 U.S. at 676; *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003)

("[S]upervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability."); *Marsh v. Butler Cnty.*, 268 F.3d 1014, 1035 (11th Cir. 2001) (A supervisory official "can have no respondeat superior liability for a section 1983 claim."); *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003) (concluding supervisory officials are not liable on the basis of respondeat superior or vicarious liability); *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) (citing *Belcher v. City of Foley*, 30 F.3d 1390, 1396 (11th Cir. 1994)) (42 U.S.C. § 1983 does not allow a plaintiff to hold supervisory officials liable for the actions of their subordinates under either a theory of respondeat superior or vicarious liability). "Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677. Thus, liability for medical or dental treatment provided to T.R.J. could attach to Defendants Struzick and Burkhart only if they "personally participate[d] in the alleged unconstitutional conduct or [if] there is a causal connection between [their] actions . . . and the alleged constitutional deprivation." *Cottone*, 326 F.3d at 1360.

Likely, however, has presented no evidence, nor can the court countenance the existence of any evidence, which would create a genuine issue of disputed fact with respect to the claim that Defendants Struzick and Burkhart acted with deliberate indifference. The record is devoid of evidence indicating that these Defendants personally participated in or had any involvement, direct or otherwise, with the medical or dental treatment provided to T.R.J.; rather, it is undisputed that Struzick and Burkhart did not participate in the provision of treatment to T.R.J. The evidentiary materials before the court demonstrate that medical personnel and a free world

dentist made all decisions relative to the course of treatment provided to T.R.J. and that they provided treatment to T.R.J. in accordance with their professional judgment upon assessment of his conditions.

In light of the foregoing, Defendants Struzick and Burkhart can be held liable for decisions of medical personnel only if their actions bear a causal relationship to the purported violation of T.R.J.'s constitutional rights. To establish the requisite causal connection and therefore avoid entry of summary judgment in favor of Defendants Struzick and Burkhart, Plaintiff must present sufficient evidence which would be admissible at trial of either "a history of widespread abuse [that] put[] [Defendants] on notice of the need to correct the alleged deprivation, and [they] fail[ed] to do so," a "custom or policy [that] result[ed] in deliberate indifference to constitutional rights, or . . . facts [that] support an inference that [Struzick and Burkhart] directed the [facility's health care staff] to act unlawfully, or knew that [the staff] would act unlawfully and failed to stop them from doing so." *Cottone*, 326 F.3d at 1360 (internal punctuation and citations omitted). A thorough review of the pleadings and evidentiary materials submitted in this case demonstrates that Plaintiff has failed to meet this burden.

The record before the court contains no probative evidence to support an inference that Struzick or Burkhart directed medical personnel to act unlawfully or knew that they would act or acted unlawfully and failed to stop such action. In addition, Plaintiff has presented no evidence of obvious, flagrant or rampant abuse of continuing duration in the face of which the Defendants failed to take corrective action; instead, the undisputed medical records indicate that T.R.J. had continuous access to medical personnel and received treatment for his conditions each

time he reported to the infirmary seeking treatment.  Finally, the undisputed evidentiary materials submitted by Defendants demonstrate that the challenged course of medical/dental treatment did not occur pursuant to a policy enacted by Struzick or Burkhart.  Thus, the requisite causal connection does not exist in this case and liability under the custom or policy standard is not warranted. *Cf. Emp't Div. v. Smith*, 494 U.S. 872, 877 (1990); *Turner v. Safely*, 482 U.S. 78 (1987).  Summary judgment is therefore due to be granted in favor of Defendants Struzick and Burkhart.

Furthermore, even had Plaintiff presented a proper basis for the claims lodged against Defendants Struzick and Burkhart, the evidentiary materials filed by Defendants, including the medical and dental records detailing the treatment provided to T.R.J., demonstrate that health care personnel did not act with deliberate indifference to T.R.J.'s medical or dental needs.

2.  <u>Medical Defendants Golden, Taylor and Chung</u>.  Likely complains that medical personnel at Mt. Meigs failed to provide T.R.J. adequate medical treatment for his head injury and denied him proper dental treatment for a chipped tooth.  Specifically, Likely challenges the courses of treatment undertaken by Defendants Golden, Taylor and Chung ("Medical Defendants").  The Medical Defendants adamantly deny they acted with deliberate indifference to T.R.J.'s medical or dental needs and, instead, maintain that T.R.J. received all necessary and appropriate treatment in response to his complaints of a head injury, headaches, and a chipped tooth.

To prevail on a claim concerning an alleged denial of adequate medical treatment, an incarcerated individual must, at a minimum, show that the defendants acted with deliberate

indifference to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97 (1976); *Taylor v. Adams*, 221 F.3d 1254 (11th Cir. 2000); *McElligott v. Foley*, 182 F.3d 1248 (11th Cir. 1999); *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989); *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986). Specifically, medical personnel may not subject an inmate to "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106; *Adams v. Poag*, 61 F.3d 1537, 1546 (11th Cir. 1995) (citation and internal quotations omitted). As directed by *Estelle*, a plaintiff must establish "not merely the knowledge of a condition, but the knowledge of necessary treatment coupled with a refusal to treat or a delay in [the acknowledged necessary] treatment." *Adams*, 61 F.3d at 1546.

> That medical malpractice-negligence by a physician-is insufficient to form the basis of a claim for deliberate indifference is well settled. *See Estelle v. Gamble*, 429 U.S. 97, 105-07, 97 S. Ct. 285, 292, 50 L. Ed. 2d 251 (1976); *Adams v. Poag*, 61 F.3d 1537, 1543 (11th Cir. 1995). Instead, something more must be shown. Evidence must support a conclusion that a prison physician's harmful acts were intentional or reckless. *See Farmer v. Brennan*, 511 U.S. 825, 833-38, 114 S. Ct. 1970, 1977-79, 128 L. Ed. 2d 811 (1994); *Cottrell v. Caldwell*, 85 F.3d 1480, 1491 (11th Cir. 1996) (stating that deliberate indifference is equivalent of recklessly disregarding substantial risk of serious harm to inmate); *Adams*, 61 F.3d at 1543 (stating that plaintiff must show more than mere negligence to assert an Eighth Amendment violation); *Hill v. Dekalb Regional Youth Detention Ctr.*, 40 F.3d 1176, 1191 n.28 (11th Cir. 1994) (recognizing that Supreme Court has defined "deliberate indifference" as requiring more than mere negligence and has adopted a "subjective recklessness" standard from criminal law); *Qian v. Kautz,* 168 F.3d 949, 955 (7th Cir. 1999) (stating "deliberate indifference" is synonym for intentional or reckless conduct, and that "reckless" conduct describes conduct so dangerous that deliberate nature can be inferred).

*Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir. 1999).

In order to properly establish "deliberate indifference to [a] serious medical need . . . , Plaintiff[] must show: (1) a serious medical need; (2) the defendants' deliberate indifference to

that need; and (3) causation between that indifference and the plaintiff's injury." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306-07 (11th Cir. 2009).  When seeking relief based on deliberate indifference, an inmate is required to establish "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need and an actual inference of required action from those facts." *Taylor*, 221 F.3d at 1258; *McElligott*, 182 F.3d at 1255 (for liability to attach, the official must know of and then disregard an excessive risk to the prisoner).  Thus, deliberate indifference occurs only when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer*, 511 U.S. at 837; *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) (defendant must have actual knowledge of a serious condition, not just knowledge of symptoms, and ignore known risk to serious condition to warrant finding of deliberate indifference).  Furthermore, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.

> In articulating the scope of inmates' right to be free from deliberate indifference, . . . the Supreme Court has . . . emphasized that not 'every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment.' *Estelle*, 429 U.S. at 105, 97 S. Ct. at 291; *Mandel*, 888 F.2d at 787.  Medical treatment violates the eighth amendment only when it is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.' *Rogers*, 792 F.2d at 1058 (citation omitted).  Mere incidents of negligence or malpractice do not rise to the level of constitutional violations. *See Estelle*, 429 U.S. at 106, 97 S. Ct. at 292 ('Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.'); *Mandel*, 888 F.2d at 787-88 (mere negligence or medical

> malpractice 'not sufficient' to constitute deliberate indifference); *Waldrop*, 871
> F.2d at 1033 (mere medical malpractice does not constitute deliberate
> indifference).  Nor does a simple difference in medical opinion between the
> prison's medical staff and the inmate as to the latter's diagnosis or course of
> treatment support a claim of cruel and unusual punishment.  *See Waldrop*, 871
> F.2d at 1033 (citing *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977)).

*Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991); *Taylor*, 221 F.3d at 1258 (citation and

internal quotations omitted) (To show deliberate indifference to a serious medical need, a

plaintiff must demonstrate that [the] defendants' response to the need was more than "merely

accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice

actionable under state law.").  Moreover, "as *Estelle* teaches, whether government actors should

have employed additional diagnostic techniques or forms of treatment 'is a classic example of

a matter for medical judgment' and therefore not an appropriate basis for grounding liability

under the Eighth Amendment."  *Adams*, 61 F.3d at 1545; *Garvin v. Armstrong*, 236 F.3d 896,

898 (7th Cir. 2001) ("A difference of opinion as to how a condition should be treated does not

give rise to a constitutional violation."); *Hamm v. DeKalb Cnty.*, 774 F.2d 1567, 1575 (11th Cir.

1985) (mere fact inmate desires a different mode of medical treatment does not amount to

deliberate indifference violative of the Constitution); *Franklin v. Oregon*, 662 F.2d 1337, 1344

(9th Cir. 1981) (prison medical personnel do not violate the Eighth Amendment simply because

their opinions concerning medical treatment conflict with that of the inmate-patient or his

parent).  Self-serving statements by a plaintiff do not create a question of fact in the face of

contradictory, contemporaneously created medical records.  *See Bennett v. Parker*, 898 F.2d

1530 (11th Cir. 1990).

The affidavits filed by Defendants address the allegations made by Likely.  A thorough review of the evidentiary materials submitted in this case demonstrates that these affidavits are corroborated by the objective medical records compiled contemporaneously with the treatment provided to T.R.J. regarding the instant claims of deliberate indifference.  Nurse Taylor provides the following synopsis of treatment afforded T.R.J. for his head injury and chipped tooth.

On or about April 14, 2011 at approximately 9:30 p.m. T.R.J. initially visited the Infirmary for a fall he sustained in Booker Hall dormitory on the DYS Mount Meigs Campus.  LPN Marcia Perkins examined T.R.J.  Based on the findings [made by] Nurse Perkins [upon her evaluation, including that T.R.J. was alert and responsive, pupils were reactive, no open wound and only a slightly raised area to the back of his head] . . . it did not appear that T.R.J. experienced a serious injury.  Nurse Perkins gave T.R.J. an ice pack and Motrin.  Nurse Perkins also recommended no participation in sports or detail for three days.  T.R.J. did not return to the infirmary until April 26, 2011.  On that day, Nurse Barbara Golden examined T.R.J.  Nurse Golden did not find any swelling on the back of T.R.J.'s head or bumps on the back of his head.  Nurse Golden also examined T.R.J.'s teeth and she observed a small chip on one of T.R.J.'s front teeth.  Nurse Golden told T.R.J. to return to the Infirmary if he had any changes.  After T.R.J.'s visit, Nurse Golden placed T.R.J. on the dental list for [referral to a free-world dentist for treatment of] a chipped tooth.  Nurse Golden did not request that T.R.J. visit the doctor based on her findings.

On May 3, 2011, T.R.J. returned to the Infirmary complaining of head pain.  He complained that he had a dull ache that hurt only when he rested his head against the wall or on occasion when he was in bed.  I examined T.R.J.'s head and there was no swelling, bruising or indication of trauma.  T.R.J. denied blurry vision, light-headedness, memory loss or confusion.  I requested that T.R.J. follow up with the Infirmary if his condition did not improve; I also recommended medication for T.R.J. for pain on an as needed basis.  I notified T.R.J.'s mother . . . of T.R.J.'s visit to the Infirmary and I notified Ms. Likely that T.R.J. had an appointment with Dr. J. Juan Chung on May 4, 2011.

On May 4, 2011, Dr. J. Juan Chung examined T.R.J.  Subsequently, on May 9, 2011, Dr. Chung referred T.R.J. to Healthscan Imaging for a CT Scan.  Staff at the Infirmary scheduled an appointment for a CT Scan on May 11, 2011.  Before his CT Scan, T.R.J. returned to the Infirmary on May 10, 2011.  During this visit to the Infirmary T.R.J. reported that a headache prevented him from sleeping.  T.R.J. also reported that he started experiencing a headache while

walking to the Infirmary; however T.R.J. did not report experiencing a headache while playing in sports such as basketball or participating in detail in the dorm. [T.R.J. was questioned regarding why he was not taking his morning dosage of Mortrin as prescribed and T.R.J. stated he was too tired to retrieve it. T.R.J. was also asked why he did not request medication from the dorm staff when he suffered a headache to which he replied he forgot the staff had medication in the dorm.] I notified T.R.J.'s dorm staff that T.R.J. would not be able to participate in sports or detail until the Infirmary received the results of T.R.J.'s CT Scan.

On the following day, May 11, 2011, T.R.J. went to Healthscan Imaging in Montgomery, Alabama for a CT Scan of his head. The Infirmary received a copy of T.R.J.'s CT Scan results on May 12, 2011 and the radiologist, Dr. Barry Smith, that reviewed T.R.J.'s CT Scan did not report any abnormal findings. On May 16, 2011, Nurse Barbara Golden scheduled an appointment for T.R.J. to visit a dentist on May 19, 2011. On May 17, 2011, T.R.J. returned to the Infirmary; he complained of a headache he experienced the night before. T.R.J. denied any pain at the time of his appointment. Nurse Katoria Gray examined T.R.J. and she did not note any abnormal findings. Nurse Gray placed T.R.J. on the list to see Dr. Chung on May 18, 2011. On May 18, 2011, Dr. Chung examined T.R.J.; Dr. Chung explained the CT Scan results to T.R.J. and Dr. Chung placed T.R.J. on a new medication.

On May 19, 2011, T.R.J. had a dental appointment with Montgomery Dentistry in Montgomery, Alabama. A dentist . . . smoothed the edge of T.R.J.'s chipped tooth with a sand paper disc. Prior to his dental appointment, T.R.J. did not complain [to facility staff or medical personnel] of pain to his teeth and he did not sign up for sick call for his chipped tooth. At approximately 7:00 p.m. on the same day, T.R.J. inquired about the length of time for his sports and detail restriction. I told T.R.J. that he just started a new medication and the Infirmary wanted him to try out the medication before removing his restrictions concerning sports and detail in the dorm.

On May 23, 2011, T.R.J. returned to the infirmary and reported to me that his headaches were essentially resolved. He reported that he had not had a headache in days. T.R.J. requested that the Infirmary remove his restriction from sports and detail. T.R.J. agreed to notify staff if [his] headaches returned and I released T.R.J. from his sports and detail restriction.

T.R.J. continues to have weekly follow-up appointments with Dr. Chung [who] . . . has examined T.R.J. [on] May 4, 2011, May 18, 2011, May 25, 2011, June 1, 2011, June 8, 2011, June 15, 2011 and June 22, 2011. T.R.J. has not signed up for sick call or returned to the Infirmary requesting treatment for head pain or headaches since May 17, 2011. [As of June 22, 2011], T.R.J. is not complaining of any head pain or headaches.

16

*Exhibit 6 to the Special Report of the Defendants (Affidavit of Richard Taylor) - Doc. No. 10-6*

at 2-5; *see also Exhibit 10 to the Special Report of the Defendants (Affidavit of Marcia Perkins) -*

*Doc. No. 10-10* at 1-2 ("On or about April 14, 2011 at approximately 9:30 p.m. T.R.J. and a

female DYS staff member came to the Mt. Meigs Infirmary.  T.R.J. reported that . . . he slipped

on the floor and hit the back of his head on the floor.  I examined T.R.J.; he was alert and

verbally responsive.  His skin was warm and dry to the touch.  His pupils were reactive to light

and equal.  The area on the back of his head was slightly raised.  There were no open areas on

his head.  T.R.J. did not report that he experienced a black out after he fell on the floor.  If he had

reported that he had a black out, I would have recommended that staff transport him to the

emergency room.  After examining T.R.J. I did not note any serious injury . . . .  I also gave

T.R.J. an ice pack for his head and Motrin for any pain.  I also recommended that T.R.J. stop his

participation in sports and detail in the dorm for three days.").

T.R.J. sought no treatment from medical personnel for any issue from April 15, 2001 until

April 26, 2011.  On this date, Nurse Golden, at the request of her supervisor who had been

contacted by Likely, had T.R.J. brought to the infirmary for evaluation.  Nurse Golden examined

T.R.J., and T.R.J. stated that he had fallen on April 14, 2011 hurting his head.  T.R.J., however,

advised Nurse Golden that he was not currently "experiencing headaches but the back of his head

had a sore spot.  T.R.J. also reported bumps on the back of his head from a hair cut and he

reported a chipped tooth which was a result of eating 'frozen peas.'"  *Exhibit 9 to the Special*

*Report of the Defendants (Affidavit of Barbara Golden) - Doc. No. 10-9* at 1-2.  Golden

examined the back of T.R.J.'s head.  T.R.J. did not report soreness during this examination and

17

Golden did observe any swelling to his head.  *Id*. at 2.  Golden also

> examined T.R.J.'s teeth and . . . noticed a small chip on one of T.R.J.'s upper right incisors.  The chip to T.R.J.'s tooth did not appear to be new.  I instructed T.R.J. to return to the Infirmary if he continued to have headaches.  I also told T.R.J. if he had any change to return to the Infirmary and the Infirmary would schedule a doctor's appointment for him.  I placed the student on the dental list to have his tooth repaired.

*Id*.  On May 19, 2011, a free world dentist examined T.R.J.  The dentist conducted an oral

evaluation of T.R.J. and determined that the appropriate treatment was to smooth and polish the

chipped tooth.  *Exhibit 2 to the Special Report of the Defendants - Doc. No. 10-2* at 8.

In addition, Dr. Chung addresses the treatment he provided to T.R.J. as follows:

> I scheduled almost weekly appointments with the patient to follow-up on his complaints of headaches.  I examined [T.R.J.] on the following days, May 4, 2011, May 18, 2011, May 25, 2011, June 1, 2011, June 8, 2011, June 15, 2011 and June 22, 2011.  The patient's condition has consistently improved during each appointment.  The patient has not complained of intensified headaches or additional symptoms.  It is my medical judgment that the patient's fall resulted in a minor contusion to the occipital area; that is the back of his head.  Based on the patient's continued progress, while under my care, I determined that referral for additional medical case was not necessary.  Currently, the patient is not complaining of any head pain or headaches.
> My first appointment with the patient occurred on May 4, 2011.  I examined the patient and he complained of  headaches lasting one to two hours.  The patient also reported headaches were improved with medication.  The patient did not report any other symptoms or visual problems.  The patient also indicated that he was able to play basketball without problems.  I examined the patient's head and I did not find any abnormalities.  The patient had a full range of motion in his neck and I did not detect any neurological deficits.  After the patient's appointment; I recommended that the Infirmary contact me to request a CT Scan if the patient's headaches were persistent.  On May 9, 2011, the Infirmary contacted me concerning the patient and I made the referral for the patient to undergo a CT Scan.
> On May 11, 2011, the patient went to Healthscan Imaging in Montgomery, Alabama for a CT Scan of his head.  The patient's CT Scan results were available on May 12, 2011.  I reviewed the results of the CT Scan and the Radiologist, Dr.

Barry Smith, that reviewed the CT Scan did [not] indicate any abnormal findings in his report.

On May 18, 2011, I examined the patient and explained the CT Scan results to the patient.  On that day, the patient reported that his headaches were getting better.  The patient also reported having headaches all over but there was no pattern to the headaches.  He also denied any family history of headaches.  As I examined the patient, I determined that he did not have blurred vision, nausea, unsteady gait or visual problems.  On that day, I also changed the patient's medication.

During my May 25, 2011 appointment with the patient; he reported that the headaches were better.  He had no specific complaints on that day.  Additionally, on June 1, 2011, I had another follow-up appointment with the patient and he reported that his headaches were better.  He also reported feeling a little light-headed after lying or sitting.  I examined the patient and I detected no neurological deficits.

On June 8, 2011, I had another follow-up appointment with the patient; on that day, the patient reported that he was feeling good; he denied any problems and he reported that he was able to play sports okay.  I examined the patient and I did not detect any neurological deficits.  I recommended that the patient taper off the medication and only use the medication as needed.  On June 15, I had an appointment with the patient; he reported that he was feeling okay.  He reported that he was participating in sports with no problems.  I examined the patient and I did not detect any neurological deficits.  On June 22, 2011 I had an appointment with the patient; he had no complaints.  He indicated that he had no more headaches.  I will continue to monitor the patient on a weekly basis.

*Exhibit 5 to the Special Report of the Defendants (Affidavit of Dr. J. Juan Chung) - Doc. No. 10-*

*5 at 1-3 .*

It is clear from the evidentiary materials submitted by Defendants that medical personnel examined T.R.J. on the day he suffered his head injury, April 14, 2011.  T.R.J. did not seek treatment for any condition from this date until April 25, 2011.  On April 26, 2011, Nurse Golden summoned T.R.J. to the infirmary for evaluation of his head injury.  After this date, medical personnel on a routine basis performed physical examinations of T.R.J. regarding his complaints of headaches and also referred him to a free world dentist for treatment of his chipped

tooth.   T.R.J. consistently received prescriptions for medications commonly used for headache/pain relief, including Motrin and Mobic.   Medical personnel also advised T.R.J. to return to the infirmary if his headaches persisted, ordered facility staff to relieve T.R.J. of his work detail and directed that T.R.J. refrain from participating in sports.   A CT scan performed of T.R.J.'s head on May 11, 2011 indicated no abnormalities.   *Exhibit 3 to the Special Report of the Defendants - Doc. No. 10-3* at 1.   The evidence before the court likewise establishes that T.R.J.'s headaches subsided over the period of time relevant to the complaint.

Under the circumstances of this case, the court concludes that the course of treatment undertaken by the Medical Defendants in addressing T.R.J.'s head injury and chipped tooth did not violate his constitutional rights.   The medical care T.R.J. received was certainly not "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to the fundamental fairness." *Harris*, 941 F.2d at 1505.   The allegations presented by T.R.J. simply fail to establish deliberate indifference by the Medical Defendants.   *Garvin*, 236 F.3d at 898 (difference of opinion regarding manner in which condition should be treated fails to demonstrate a constitutional violation).   As is the issue here, whether medical personnel "should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis" on which to ground constitutional liability.   *Adams*, 61 F.3d at 1545-46.   In addition, an inmate's allegation that medical personnel did not diligently pursue alternative means of treating his condition "did not 'rise beyond negligence'. . . to the level of deliberate indifference." *Id*.; *Hamm*, 774 F.2d at 1505 (inmate's desire for some other form of medical treatment does not constitute deliberate

indifference violative of the Constitution); *Franklin*, 662 F.2d at 1344 (simple divergence of opinions between medical personnel and inmate-patient do not violate the Eighth Amendment).

It is undisputed that T.R.J. received treatment for headaches and a chipped tooth and that medical personnel rendered this treatment to T.R.J. in accordance with their professional judgment. In addition, Plaintiff has failed to present any evidence which indicates Defendants knew that the manner in which they provided treatment to T.R.J. created a substantial risk to his health and that with this knowledge consciously disregarded such risk. The record is therefore devoid of evidence, significantly probative or otherwise, showing that Defendants acted with deliberate indifference to T.R.J.'s medical or dental needs. Consequently, the court concludes that summary judgment is due to be granted in favor of the Medical Defendants on the claims presented by Likely. *Carter*, 352 F.3d at 1350; *Holifield*, 115 F.3d at 1564 n.6; *Harris*, 65 F.3d at 916.

### IV. CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1. The defendants' motion for summary judgment be GRANTED.

2. Judgment be GRANTED in favor of the defendants.

3. This case be DISMISSED with prejudice.

4. Each party bear the burden of their own costs.

It is further

ORDERED that the parties are DIRECTED to file any objections to the said Recommendation on or before **August 28, 2014**. Any objections filed must specifically

identify the findings in the Magistrate Judge's Recommendation to which the party is objecting. Frivolous, conclusive, or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); s*ee Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982); s*ee also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Done this 14th day of August, 2014.

/s/ Wallace Capel, Jr.
WALLACE CAPEL, JR.
UNITED STATES MAGISTRATE JUDGE